In the Matter of the Estate of ELIZABETH MEYERS, Deceased.

Surrogate's Court, New York County, June 2, 1937.

*Eisman, Lee, Corn & Lewine* [*Joseph J. Corn, Jr.*, of counsel], for the temporary administrator.

*Powers & Hopkins* [*Walter J. Hopkins* of counsel], for Sarah A. Kelly, claimant.

*Silver & Bernstein* [*Nahum A. Bernstein* of counsel], for Mrs. Elizabeth M. Cuff, claimant, and for Howard H. Meyers.

*Henry W. Sykes*, for Florence B. Sykes, objectant.

*Harry Heiman* [*Philip D. Greenspan* of counsel], for Dr. Henry W. Lloyd, claimant.

DELEHANTY, S. Deceased died January 13, 1936. Among the claims against her estate was a claim for wages for the months of January and February, 1936, made by an employee who had been with deceased since the year 1913. This particular claim was adjusted by consent at the sum of $50. The same employee made a further claim against the estate in the sum of $5,000. She based this claim upon an alleged contract of deceased that if the employee would remain as such throughout deceased's life the latter would provide $5,000 for the employee by will. Concededly no such provision is in the will of deceased. Concededly claimant rendered service as housekeeper to deceased during the years 1913 to 1936. She claims, also, to have rendered special service to a daughter of deceased for a period of six years prior to deceased's death. Since the contract alleged is dated earlier than the rendition of these latter services, the fact of such service seems not to be important on this issue. Claimant concedes that over the entire period of her service to deceased she received a fixed monthly wage.

In support of her claim for $5,000 claimant called as a witness a friend who is also in domestic service and who professes to recall the exact tenor of a conversation overheard by the witness between deceased and claimant in October, 1926. This occurrence of more than ten years ago is stated by the witness in two forms not reconcilable with each other. She quotes deceased as having said that she would put $5,000 in cash in a safe deposit box for claimant and would do this unknown to deceased's daughter who was then

living with deceased. The witness reports deceased also as saying in the same conversation that she would provide $5,000 for claimant in deceased's will. On her cross-examination this witness volunteered that up to the time of her appearance on the stand she had talked only to God about this conversation of ten years before and that no one in the world knew anything about the conversation (other than claimant) until the witness had repeated it on the stand under oath. When claimant's counsel on redirect examination recalled to the witness that she had in fact talked to him about the conversation on several occasions she made the distinction that she had not done so at his office — a distinction not entirely clear to the court. Plainly the witness is not to be relied upon. Plainly she phrased in contract terms a conversation which was no more than an expression of this elderly woman that she would remember her faithful domestic in her will. That this was the nature of deceased's declarations is proved by the testimony of a daughter of deceased who was called by claimant and who said that her mother had always declared that she would " remember " the claimant and " certainly would not forget her."

The general unreliability of the main witness for claimant is evident in other portions of her testimony. The witness recited her close friendship for claimant and the frequency of her visits to claimant in deceased's house and among other things asserted that the witness had seen and talked with deceased frequently in each month of the summer of 1926. The cross-examination of the daughter of deceased who was called as claimant's witness disclosed that deceased throughout that whole summer had been abroad. The proof otherwise given on the part of the estate confirmed the fact that deceased did not return from abroad until October 5, 1926. The case is typical of that class of claims wherein words of deceased persons are twisted into contract undertakings and wherein false constructions are put upon words which, if fully and accurately reported, would furnish no support to any claim. On the whole record the court determines that the claim is without basis and overrules the objection of claimant to the disallowance thereof.

Further objection to the account was made by a daughter of deceased who had lived with her practically continuously up to deceased's death. This claimant asserted ownership (a) of various shares of stock, (b) of New York Edison bonds having a face value of $2,000, and (c) of $500 in gold coin. As to the shares of stock the parties in interest consented to the allowance of the claim and that branch of it was disposed of by such consent.

As to the Edison bonds the proof is clear that they were at all times in the safe deposit box of deceased and that continuously

until her death she received the income from the coupons. In the case of the gold the proof establishes that when deceased's safe deposit box was opened there was found in it a substantial quantity of gold coin. Part of this gold coin was in envelopes, part in two small bags (one of which was a chamois bag) and the rest was loose in the box. The claim is to the particular sum of $500 in gold which was contained in the chamois bag upon which were three initials " E. M. M." These are the initials of claimant. There is some testimony that the first two of these initials had been on the bag for a considerable time before the third initial was put thereon. The first two initials are those of deceased. The particular bag and its contents appear at one time to have been the property of Augustus Meyers, the deceased husband of Elizabeth Meyers. The gold appears to have been given by Augustus Meyers to his wife during their married life. Plainly the history of the gold and of the bonds and the conceded ownership thereof by deceased at one time placed upon claimant the burden of establishing by clear and convincing evidence a transfer of title to claimant.

In the effort to sustain this burden both as to the Edison bonds and as to the gold claimant called as a witness her brother who had been allied with claimant in family controversies which followed the death of deceased. This brother of claimant testified respecting the bonds that on an occasion when he aided his mother in preparing an income tax return the coupon income was discussed and deceased is alleged to have said to this witness that she had given the Edison bonds to claimant. This same witness also testified to an alleged separate conversation of deceased with him in which the witness says deceased stated that the bag of gold had been given to claimant. The entire evidence of this witness is rejected by the court as untrue. The attitude of the witness upon the stand, the manner and the content of his testimony as to these alleged conversations with his mother and the disclosure of the motives which plainly were operating upon him in the giving of his testimony, all require rejection of it. In addition there is cogent evidence against both claims supplied by documents concededly signed by deceased at the request of claimant. There were two of these documents. One was in each of the two safe deposit boxes of deceased. The forethought which the preparation of the papers evidences on the part of claimant and the care with which she put the papers into deceased's safe deposit boxes where they would be called to the attention of deceased's executor prove circumstantially that these now asserted claims are without substance. The papers recite the ownership by claimant of certain specific property which then was in the box of deceased and was there when deceased died. The date of

preparation of the documents is much later than the date of the alleged conversations which are offered in support of the claim of gift and hence, of course, later in date than the alleged gifts. If in deceased's liftime either claimant or deceased regarded the Edison bonds or the bag of gold as the property of claimant it is unexplainable that claimant should have prepared and deceased should have signed for the benefit of claimant a declaration supporting claimant's title to other property but omitting all reference to the bonds and the gold.

Comment should be made on testimony proffered by claimant herself respecting the writing on the chamois bag. Her counsel asked her if she knew the writing of deceased and she answered, " Yes." Claimant was then asked whether or not the writing of the initials on the bag containing the gold was the writing of deceased. To that question objection was interposed. In the colloquy which ensued respecting the qualifications of the witness her counsel frankly stated that the only possible basis for the expression of an opinion by the witness concerning the writings on the bag was a series of communications from or transactions of the witness with deceased in the course of which the witness learned to know deceased's habits of writing. Counsel argued that the knowledge so possessed by the witness, i. e., the knowledge of deceased's handwriting, was a fact to which the witness could testify because the *fact* was independent of a transaction with deceased. If once the expert qualification of the witness is conceded or the patent obstacles to such qualification overcome, there is support for counsel's position in the language of some of the opinions (31 A. L. R. 460; Greenfield, Testimony under Section 347, C. P. A. § 204, p. 291). On this hearing the qualifications of the witness were not conceded. On the contrary, the objection to her testimony raised the point that any opinion expressed by her must necessarily be based upon communications from or transactions with deceased.

In those cases which sustain the admissibility of the evidence the necessity of qualification through non-objectionable sources is presupposed unless as already stated the test of qualification is waived. The intrinsic nature of testimony as to handwriting is the expression of an opinion of the witness that the writing exhibited on the trial resembles something else which the witness has seen. In the ordinary case there is a mental operation involved. In the case here for decision the daughter of deceased in expressing an opinion as to the writing on the chamois bag must necessarily have been prepared to say: " These initials are just like something which I saw my mother write in my presence." The statement of that

underlying basis to the testimony makes it quite apparent that what the witness was called to say would in reality have been testimony of a transaction with a deceased person. The subject has been considered in this department. (*Wilber* v. *Gillespie*, 127 App. Div. 604, 612.) CLARKE, J., writing for a unanimous court, there said: " The precise evidence excluded in the case at bar was evidence of a transaction between the plaintiff and the decedent, by which the plaintiff derived impressions or information from the conduct of the decedent. The conduct was his writing his name in her presence a sufficient number of times to produce in her mind an impression or information from which, upon being shown another piece of paper, she would be qualified to testify that in her opinion it was the same handwriting with which she had familarized herself in a transaction with him. In my opinion the evidence was properly excluded." On the authority cited and on principle the testimony offered by the daughter of deceased was properly excluded.

The objection filed by the physician who attended the daughter of deceased and whose claim against deceased was disallowed has been disposed of by an agreement reached between the claimant and the parties whereunder sixty-seven dollars and fifty-five cents is to be paid to claimant.

The numerous objections to the account filed in behalf of one of the legatees were disposed of by rulings made upon the record at a hearing on April 12, 1937, except as to objections 5 and 12. Objection 5 has since been disposed of by agreement of the parties. Objection 12 will be disposed of as indicated in the hearing of April 12, 1937, with the further proviso that the five per cent management fee authorized by subdivision 9 of section 285 of the Surrogate's Court Act will be applicable only to gross rents actually collected by the temporary administrators after qualification and will not be applied to rents collected by an agent before qualification and turned over by the latter to the administrators when qualified.

The application of the attorneys for the temporary administrators for fixation of their fees is granted and the sum of $1,000 is allowed them for all services except the services in the so-called Odora action. The court reserves the fixation of compensation in this action until the conclusion of it and the ascertainment of the net results to the estate. Sufficient reserve must be held by the executor to cover an allowance eventually to be made for these services. The allowance here made is in lieu of costs and, with the exception noted, is to cover all services to the entry of the decree. Actual necessary disbursements on the accounting may, however, be taxed.

Submit, on notice, decree settling the account accordingly.