Isidobi Wasservogel,
Spec. Ref. This is a proceeding under article 78 of the Civil Practice Act whereby petitioner seeks an order annulling and rescinding a determination of the Municipal Civil Service Commission which removed his name from the eligible list for patrolman, New York City Police Department, and terminated his appointment as a probationary patrolman. Petitioner also seeks an order directing respondents to recertify, reinstate and restore him to the Police Department as a probationary patrolman, with back pay and allowances.
The petition alleges that respondents’ determination was based upon ‘ ‘ an unsubstantiated claim that petitioner was or is a member of the Communist Party, or that he sent a telegram relating to a conviction of certain members of the Communist Party” to a Judge of a Federal court. Respondents denied these allegations and, in their answer to the petition, contend that their determination that petitioner was not qualified to hold the position of patrolman was based upon statements made by petitioner at a hearing before the Municipal Civil Service Commission in January, 1953, and upon the reports made to the Municipal Civil Service Commission by its investigators.
The matter was argued before Mr. Justice Greenberg, sitting in Special Term, Part I, on December 21, 1953. By an order dated February 18, 1954, he directed that certain framed issues be tried by the court ‘ ‘ to determine whether or not the respondents acted arbitrarily in-discharging petitioner as a probationary patrolman.” There are two principal issues of fact involved herein, to wit: (1) Was petitioner disqualified and dismissed from the Police Department by reason of an unsubstantiated claim that the petitioner was or is a member of the Communist party, or that he allegedly sent a telegram relating to the conviction of certain members of the Communist party?; (2) Was petitioner marked disqualified by the Municipal Civil Service Commission because of statements made by petitioner at a hearing held before the Municipal Civil Service Commissi on on January 5, 1953, and because of an investigation of petitioner made by a police academy investigator? It is with these two issues that the court is primarily concerned.
It is well-settled law that the Civil Service Commission may inquire into the character and reputation of applicants for public employment and exclude from such civil service of the State *15 or municipality any person it deems unfit to occupy a public position by reason of “ indolence, inadaptibility to the service, garrulousness, want of character, experience, tact, integrity, or a lack of proper disposition, or the existence of habits which would render him quite unfit to assume the duties of the position and yet not be actually incompetent.” (People ex rel. Sweet v. Lyman, 157 N. Y. 368, 381; People ex rel. Walter v. Woods, 168 App. Div. 3; Friedman v. Schwellenbach, 159 F. 2d 22, cert, denied 330 U. S. 838.) The law is equally well settled, however, that the disqualification or removal of a person’s name from the eligible list for a public employment must have as its basis sound logic and reasoning rather than mere arbitrary, discriminatory, or capricious presumption. (Wieman v. Updegraff, 344 U. S. 183; Matter of Hamilton v. Brennan, 203 Misc. 536; Matter of Bridgman v. Kern, 257 App. Div. 420, 436-437, 445, affd. 282 N. Y. 375.)
The court is aware of the vital function of the police as the guardian of law and order and the need for a thoroughly reliable personnel in the Police Department. The court also recognizes that the acts of the Civil Service Commission, as an administrative body, may only be questioned when some provision of the Constitution or of a statute which vests no discretion in the commissioners has been violated, or when such discretion is illegally and/or unreasonably exercised (Matter of Bridgman v. Kern, supra, p. 444). Under the doctrine of Wieman v. Updegraff (supra), if petitioner’s exclusion from public employment was the result of respondents’ arbitrary determination, he has been denied a fundamental right given to him by the Constitution and it is the duty of this court to set aside such action of the administrative body here involved.
An examination of the record adduced upon the trial shows that respondents’ action in dismissing petitioner was, for the most part, predicated upon unwarranted and invalid conclusions set forth in the report submitted to the commission by an investigator for the police academy. It is most unfortunate that petitioner’s loyalty and purported Communist affiliation were made issues of the instant litigation. Although there is no evidence whatever that petitioner was ever a member of or otherwise identified with any subversive group, there can be no dispute about the consequences visited upon a person excluded from public employment on the suspicion of disloyalty. In time of ‘ ‘ cold war ’ ’ and ‘ ‘ hot emotion, ’ ’ the stain is a deep one and the taint a badge of infamy. Indiscriminate classification of innocent persons with alleged disloyal activity must be condemned as an assertion of arbitrary power. (Wieman v. *16 Updegraff, supra, p. 191.) The only “ evidence ” offered to show petitioner’s purported Communist affiliation was a telegram bearing the typed name “ Leon Haynes,” which was sent to a Federal Judge on June 5, 1949, protesting the imprisonment of 11 Communists on trial before him. Petitioner has consistently sworn, both before the Civil Service Commission and this court, that he is a loyal American, that he has never been a member of any subversive organization and neither subscribes to nor sympathizes with subversive doctrines. The record is completely barren of anything which militates against the truth of these sworn declarations. In any event, the telegram, in and of itself, cannot serve to support any contention with reference to petitioner’s alleged disloyalty. (Matter of Hamilton v. Brennan, 203 Misc. 536, 538, supra.)
Respondent Brennan testified that in his disqualification of petitioner he “ discarded ” the factor of petitioner’s alleged Communist affiliation. This testimony, however, is not consonant with an affidavit submitted by respondents with their answer to the petition, wherein Brennan stated: “ His (petitioner’s) record also disclosed that he had been a member of the National Maritime Union, an organization which was dominated by Communists at the time of his membership and is considered a Communist front ’ ’.
Thus, contrary to respondents ’ contention, it appears that the unsupported charge of subversive affiliation was not completely abandoned by them. This fact is also apparent from an examination of the report submitted to the commission by one Hennessey, investigator for the police academy, which report admittedly was a prime factor in respondents’ determination. It is significant that although Hennessey claimed he read this report prior to submitting it to his superiors and the commission, he also admitted that it was not his custom to do so in all cases. From the substantial errors which appear in the report, however, the court may reasonably infer that Hennessey may have neglected to check the matter set forth therein before he sent it to the commission for its use. The report contains many inaccuracies, misstatements and errors of fact which go to the very heart of the vital issues here involved. For example, and as hereafter more fully discussed, Hennessey, in purported reliance upon the unconfirmed statement of an unidentified clerk, set forth in his report as a positive fact that petitioner failed to reveal a lengthy confinement in a hospital. Records of the hospital involved ultimately disproved this statement. Likewise, with respect to the dates of issuance and account numbers *17 of the social security cards held by petitioner, the report submitted by Hennessey was confused and incorrect.
It is to be noted that it was not until after the Hennessey report was received by respondents that they acted to dismiss petitioner. Prior to the filing of such report, petitioner, significantly, was serving as a patrolman and performing his duties to the satisfaction of his superiors. Inasmuch as respondents certified petitioner and appointed him to the Police Department after a hearing before the Civil Service Commission, the inevitable conclusion must be that the Hennessey report thereafter received by respondents, was a principal factor in the subsequent determination to dismiss petitioner. The fact that the report upon which respondents evidently relied so heavily was inaccurate and erroneous must be given great weight by the court in determining whether petitioner was properly disqualified and removed from civil service employment by them.
It is charged by respondents that petitioner failed to co-operate in his investigation by not producing certain employment records, by failing to set forth periods of unemployment, by failing to reveal that he held three social security cards and by failing to list treatment for past illnesses in the Police Department form. Contrary to respondents’ contentions, there is no basis for their subjective conclusion that petitioner did not co-operate with his investigation. The record clearly establishes that petitioner signed releases for an investigator to obtain access to draft and social security records and that petitioner went to Baltimore, Maryland, by plane in an effort to expedite the inquiry into his social security status. Likewise, the reluctant admissions by Hennessey show that petitioner did co-operate in his investigation to the best of his ability. The mere fact that Hennessey’s report on petitioner was not completed until approximately six months after petitioner was requested to produce certain records is not sufficient basis to attribute any delay or lack of co-operation to petitioner. On the contrary, documentary evidence establishes that during the course of his investigation, the police academy investigator misplaced certain of petitioner’s papers, which fact accounts for any subsequent delay in the filing of his report.
Respondent Brennan stated that in dismissing petitioner, the action was taken pursuant to section 14 of the Civil Service Law. Subdivision 4 thereof provides as follows: ‘ ‘ Disqualification of applicants or eligibles. The civil service department and municipal commissions may refuse to examine an applicant, or after examination to certify an eligible, who * * * has *18 intentionally made a false statement of any material fact, or practiced, or attempted to practice, any deception or fraud in his application, in his examination, or in securing his eligibility or appointment. ’ ’ (Italics added.)
Nothing in the record warrants the conclusion that there were intentional false statements made by the petitioner or that he in any way attempted to deceive or to practice a fraud upon respondents. Although prior to 1946 petitioner admittedly had three different social security cards, his unrebutted testimony establishes that in 1946, pursuant to a directive of the Social Security Administration, all three accounts had been combined into one. Thus, at the time petitioner gave his answer to the police academy investigator’s inquiry about his social security number in 1952, he was truthful in saying that he had only one account. His explanation to the investigator of his one-time possession of three social security cards reveals neither fraud nor an attempt to conceal his identity. At best, the three cards indicate nothing more than a youthful caprice of changing his middle name. It is significant to note that on all three cards, petitioner retained his given name, his surname, and correct residence. Under well-settled legal principles, petitioner has a right to change his name and assume one other than that given to him at birth. This right is not affected by the statute whereby a change of name is authorized by judicial proceedings. It necessarily follows, therefore, that petitioner was not guilty of a deception or fraud or false statement in holding three social security cards within the meaning of subdivision 4 of section 14 of the Civil Service Law. No claim is made by respondents that petitioner had been guilty of anything which could have affected a failure to appoint him, had the middle name formerly used by him been known at the time of his employment as a Probationary Patrolman. (See Lana v. Brennan, 124 N. Y. S. 2d 136.)
There is no merit to the charge that petitioner failed to reveal past illnesses. Contrary to what is set forth in the report of the respondents’ investigator, the credible testimony and documentary evidence establish that petitioner was not confined to Marine Hospital for four months. Petitioner’s hospital records show no extended period of hospitalization. Moreover, the police academy investigator’s own testimony shows that petitioner “ of his own volition” submitted a list of his illnesses during his investigation period. Such list merely indicates petitioner’s indecision to set forth a tonsillectomy, prostate gland massages, and the extraction of teeth as “ illnesses.”
Great weight has been attached by respondents to the fact that petitioner allegedly lied about his presence in New York *19 on June 5,1949, when the telegram bearing the name of “ Leon Haynes ” was sent, as above noted. The record reveals, however, that petitioner at no time took an inflexible position with respect to his absence from the State in June, 1949. In 1953, at the hearing before the Municipal Civil Service Commission, petitioner stated that it was “ a possibility I wasn’t even in the country ”. His later testimony on the trial before this court is consistent with his prior position of uncertainty as to his whereabouts in or about June, 1949. A subsequent check with his employers’ records established that petitioner was, in fact, absent from New York throughout most of the month of June, 1949. Petitioner, however, was dismissed by respondents three days before he was able to produce such written confirmation of his physical location on the date in question. Nevertheless, it is apparent that respondents’ investigator was, at the very least, overzealous in stating in his report that petitioner unreservedly averred to his absence from New York on June 5,1949.
Concededly, as respondents contend, the Municipal Civil Service Commission has the right, if not the duty, to rely upon the presumption of the accuracy of the report submitted to it by its own investigator or that of another city department which has undertaken to investigate applicants for positions in its department. Such presumption, however, has been effectively rebutted in the instant proceeding. Moreover, as above noted, although respondents sought upon the trial to disregard the allegations of subversion against petitioner as any ground upon which his dismissal was based, that position is not consistent with the documentary proof, inasmuch as after the dismissal of petitioner and after the commencement of this proceeding, there was annexed to respondents’ answer an affidavit by the respondent Brennan in which he made communism a prime cause of petitioner’s dismissal. A similar affidavit was submitted in behalf of Hennessey, who, even upon the trial of this proceeding, still maintained that petitioner belonged to what he considered a “ Communist union.” It is idle, therefore, for respondents to urge that they discarded the Communist charges against petitioner before dismissing him. These affidavits do not support this position.
Accordingly, the failure of respondents to establish any intentional falsity or deceit on the part of petitioner, their reliance upon the report which is, in large part, erroneous, the utter absence of proof of any subversive activity or affiliation on the part of petitioner, and the failure to establish that petitioner refused in any way to co-operate in his investigation, all combine to make petitioner’s dismissal by respondents an arbitrary, *20 capricious, and unreasonable act. The determination that the petitioner is not qualified is annulled and the respondents are directed to restore and reinstate him as a probationary patrolman, as prayed for in the petition. The framed issues of fact are disposed of in accordance with the foregoing.
Settle order within five days on two days’ notice.
The above constitutes the decision of the court as required by the applicable provisions of section 440 of the Civil Practice Act.